717 So.2d 702 (1998)
Larry K. MARDIS, Plaintiff-Appellee,
v.
Charles Wayne BRANTLEY and Joan M. Brantley, Defendants-Appellants.
No. 30773-CA.
Court of Appeal of Louisiana, Second Circuit.
August 25, 1998.
*703 Travis M. Holley, Bastrop, for Defendants-Appellants.
Charles E. Herring, Jr., Bastrop, for Plaintiff-Appellee.
Before MARVIN, C.J., and NORRIS and GASKINS, JJ.
MARVIN, Chief Judge.
In this dispute regarding the use of neighboring properties in the McClendon & White Subdivision on U.S. Highway 165 in Bastrop, defendants Charles Brantley and his wife appeal a judgment in favor of plaintiff, Larry Mardis, preliminarily enjoining the Brantleys from operating a used car lot on their property. The Brantleys own and reside on a portion of Lot 3 (sometimes called Lot 3-A), and the adjoining Lot 2, which is vacant.
*704 Mardis owns and resides on the remainder of Lot 3 (sometimes called Lot 3-B). Each of the other three lots in the plat of the subdivision recorded in 1959 has been leased as farmland for many years.
The trial court granted the injunction on the basis of a restriction in a 1959 deed quoted infra, prohibiting the sale of the property for commercial purposes by the purchaser without the approval of the vendor. Brantley acquired Lot 3-A in 1994, "subject to" the 1959 restriction. Brantley acquired Lot 2 in a 1995 deed which did not mention the 1959 restriction. Mardis is not Brantley's vendor, nor is he in the chain of title to Brantley's two lots. Mardis and the Brantleys are the sole litigants in this action.
Mardis does not seek to enjoin a sale of the Brantley property for a commercial purpose, but Brantley's commercial use of the property. After noting that the restriction in the 1959 deed "could have been worded better," the trial court construed the restriction as a predial servitude prohibiting commercial use of Lots 2 and 3-A and operating in favor of all other lots in the subdivision, including Mardis's lot. We agree with Brantley's contention that the 1959 restriction did not create a predial servitude, but simply imposed a personal obligation on each vendee in favor of his respective vendor in the deeds which mention the 1959 restriction.
On this record, we reverse.

APPLICABLE LAW
A party seeking a preliminary injunction in a case involving a contractual obligation not to do need not show irreparable injury but must make a prima facie showing that he will likely prevail on the merits of the action for a permanent injunction. La. C.C.P. art. 3601; Louisiana Gaming Corp. v. Rob's Mini-Mart, Inc., 27,920 (La.App.2d Cir.1/24/96), 666 So.2d 1268.
An agreement restricting the use of immovable property may constitute either a personal obligation binding only on the parties to the agreement or a predial servitude binding on the successors in title of the parties. In order to constitute a real right rather than a personal obligation, the restriction must be established for the benefit of an estate rather than for the benefit of a particular person. La. C.C. arts. 646-647, 731-734; McGuffy v. Weil, 240 La. 758, 125 So.2d 154 (1960); Levy v. Graham, 347 So.2d 1180 (La.App. 1st Cir.1977). Compare Le Blanc v. Palmisano, 43 So.2d 263 (La.App. Orl.1949).
A predial servitude restricting or prohibiting commercial use of property is a negative nonapparent servitude which may be acquired only by title. La. C.C. arts. 706, 707, 739; McGuffy, Levy, supra. Once the document creating the servitude is recorded in the public records, the restriction is binding on subsequent owners who acquire the servient estate without further mention of the restriction in the act conveying the servient estate. See Burgas v. Stoutz, 174 La. 586, 141 So. 67 (1932).
When a predial servitude is created by title, the intention of the parties to place a charge on one estate for the benefit of another estate, and the extent of the charge, must be expressed on the face of the title document and cannot be inferred or implied from vague or ambiguous language. The title document must also reasonably identify the dominant estate and the servient estate. Any doubt or ambiguity as to the existence, extent or manner of exercise of a predial servitude must be resolved in favor of the servient estate. La. C.C. arts. 730-734; McGuffy, supra; Ogden v. Bankston, 398 So.2d 1037 (La.1981); Camellia Place Subdiv.-Block 1 Assn. v. Willet, 491 So.2d 764 (La.App. 3d Cir.1986), writ denied; Williams v. Wiggins, 26,060 (La.App. 2d Cir.8/17/94), 641 So.2d 1068.

McCLENDON & WHITE SUBDIVISION
Each of the five lots platted in the 15-acre tract comprising the McClendon & White Subdivision contained three acres and fronted on U.S. Hwy. 165, a north-south highway forming the western boundary of the subdivision. No restrictions were filed with the plat. After recordation of the 1959 plat, the state expropriated more than an acre from the front of each lot to relocate the U.S. *705 Hwy. 165 right of way. This reduced the size of each lot to slightly more than 1.5 acres.
Lot 3 was later divided into two smaller lots, Brantley's Lot 3-A containing 0.7 acres and Mardis's Lot 3-B containing 0.9 acres. Brantley's Lot 3-A has highway frontage, while Mardis's Lot 3-B has no highway frontage but apparently has access to the highway through a private road called Mardis Drive.
The relationship, present and former dimensions, and respective locations of the lots in the subdivision are shown on this 1996 survey introduced in evidence at the injunction hearing:
*706 
*707 Brantley's home faces Hwy. 165. Mardis's home faces north toward Lots 1 and 2 and Naff Street, an east-west street which crosses Hwy. 165 and forms the northern boundary of the subdivision. Mardis's relative, Iris Jo Mardis, owns a portion of Lot 1 and maintains a small residence there. The remainder of Lot 1, apparently owned by the McClendon family, and Lots 4 and 5, now owned in indivision by Mardis and his two brothers, are leased as farmland.

THE USED CAR LOT
Brantley began operating his used car business on Lot 3-A immediately after he acquired that lot in early 1994. He advertised the business by placing a "Brantley's Used Cars" sign on his property near Hwy. 165. After buying Lot 2 in May 1995, Brantley spent several months clearing brush from the lot and having it paved with asphalt, preparing to expand his used car lot. Brantley continued to keep some used cars on Lot 3-A thereafter, moving all of them to Lot 2 only after Mardis built a wooden fence along the property line between his home and Brantley's home, apparently in 1996.
According to the testimony and photographs introduced at the hearing, Brantley's inventory gradually increased from less than ten cars on Lot 3-A in early 1994 to more than 30 on Lot 2 by September 1996, when Mardis brought his action for injunctive relief. On either lot, the used cars are clearly visible from Mardis's home.
Mardis alleged that he "cannot look out of his home without seeing a large number" of Brantley's used cars. He also claimed the noise and traffic congestion from Brantley's business disturbed his use and enjoyment of his property.
At the preliminary injunction hearing in October 1996, Mardis testified that he "intended to live in a residential area" when he bought Lot 3-B in 1967. The unsightliness of the used car lot was the primary disturbance Mardis described at the hearing. Mardis did not testify about past or present noise generated by Brantley's business. He said Brantley's customers were not presently walking across his yard or causing any traffic problems, though they sometimes turned around in his driveway.
The Steve Graves new car dealership is located about a half mile north of Brantley's used car lot, on the opposite side of Hwy. 165 and to the north of Naff Street. Mardis testified he "can see [the Graves lot] some but ... [i]t's not right out in ... my front yard when I walk out the door."

THE RESTRICTION
Mardis sought to have Brantley enjoined from operating his used car business on either or both Lots 2 and 3-A on the basis of the restrictive clause which appears in both the April 1959 deed of the undeveloped 15-acre tract by Spyker, the vendor, to the original subdividers, McClendon and White, and the October 1959 deed of Lots 2-5 to Mardis's father, Rudie Mardis, by McClendon and White, who retained ownership of Lot 1. Both sales are on a printed standard cash deed form. In each deed, this typewritten restriction follows the property description:
It is understood and agreed by and between the Vendor and Vendees that the Vendees will not sell any of the above described property for commercial purposes without the approval of the Vendor. (Our emphasis.)
In each sale, the restrictive clause is followed by the usual printed habendum clause in a cash deed form:
TO HAVE AND TO HOLD said property unto the Vendee and the heirs, successors, transferees and assigns of the said Vendee, forever.
The quoted restriction appears in some, but not all, later links in the chain of title to Lots 2 and 3.

CHAIN OF TITLE TO LOTS 2 AND 3
Soon after plaintiff's father acquired Lots 2-5 in late 1959, he sold Lot 2 to a third party, Jimmie Neal Atkins, and sold Lot 3 to his son Bobby, plaintiff's brother. Each of these deeds contains the quoted restriction. Bobby Mardis retained ownership of the portion of Lot 3 now known as Lot 3-A, where he lived for many years, and sold what is now Lot 3-B to another brother, R.C. Mardis, Jr., in 1960 by a deed that contains the same restriction.
*708 Lot 2
The restriction is not mentioned in any subsequent links in the chain of title to Lot 2: a 1988 community property settlement between Atkins and his wife, a February 1995 sale by Mrs. Atkins to Gary Ramshur and the May 1995 sale by Ramshur to the Brantleys.
Lot 3-A
On February 9, 1994, Bobby Mardis sold Lot 3-A to Brantley in a deed containing this language:
Subject to restrictions contained in deeds recorded in Conveyance Book 194, Page 485 [the 1959 sale by Spyker to McClendon and White], Conveyance Book 197, Page 148 [the 1959 sale by McClendon and White to Rudie Mardis], and Conveyance Book 197, Page 150 [the 1959 sale by Rudie Mardis to Bobby Mardis], all of the records of Morehouse Parish, Louisiana, said restrictions regarding use for commercial purposes.

(Our emphasis and brackets.)
This language "subjects" the Brantley Lot 3-A to the 1959 restriction while mislabeling the 1959 restriction as a "use" restriction. The vendor, Bobby Mardis, did not, in the deed to Brantley, create a predial servitude use restriction.
Lot 3-B
In 1961, R.C. Mardis, Jr. sold Lot 3-B to his mother, Edna Lampkin Mardis. Mrs. Mardis's husband and three children acquired her interest in the property by judgment of possession in her succession in 1963. Mardis purchased the interest of his father and his brothers in Lot 3-B in 1967, and acquired his former wife's interest in Lot 3-B in a 1974 community property settlement. The restriction against commercial sales is not mentioned in any of these recorded instruments.
Plaintiff Larry Mardis has never owned an interest in Lot 2 or Lot 3-A.
Brantley testified he operated a used car lot at his previous home and he bought this property because of its location on Hwy. 165 to continue that business. He said he told Ramshur and Bobby Mardis, his respective vendors, that he was going to put a car lot on the respective lots he bought and they expressed no objection.
Neither Ramshur nor Bobby Mardis was made a party to the action or called as a witness at the preliminary injunction hearing. Brantley offered affidavits from each vendor as evidence that he had no objection to Brantley's commercial use of the property. The trial court excluded the affidavits, on Mardis's hearsay objection. That ruling is not at issue in this appeal.[1]

ARGUMENTS AND FINDINGS IN TRIAL COURT
In the trial court, Mardis asserted the 1959 restriction was a real right running with the land, while Brantley claimed it was simply a personal obligation enforceable only by the parties to the acts in which the restriction appears. Brantley noted that the restriction was not included or referred to by reference in his acquisition of Lot 2. As to Lot 3-A, which he acquired in 1994 "subject to" the 1959 "sale" restriction, Brantley asserted Mardis had no right of action to enforce the restriction because he was not a party to the 1994 deed.
According to Brantley, the 1959 restriction simply "gives a vendor the right to sue his vendee if he sells his lot for commercial purposes." Mardis, on the other hand, maintains the restriction was intended to prohibit both the sale and the use of the property for a commercial purpose.
At the preliminary injunction hearing, the trial court observed that the restriction "could have been worded better.... I don't think it's much doubt that the [1959] vendors attempted to do just what you described [restrict the use of the property]. The issue is whether or not they actually were effective in doing it.... [The restriction] says [only that the Vendee] will not sell but the intent of it of course was to restrict the commercial *709 use of ... the sold property," which included Lots 2 and 3-A now owned by the Brantleys. Our brackets.
In written reasons for judgment rendered in September 1997, almost a year after the hearing, the trial court made these findings:
... It seems clear that the beneficiaries of the [restriction] wanted to create a residential area free of commercial concerns....

[T]he language in [the 1959 sale of the undeveloped tract by Spyker to McClendon and White] creates a right that is not beneficial only to one owner or set of owners. Indeed, the type of right contemplated in the language is designed to benefit the severally [sic] mutually dominant-servient estates that were created by the subdivision of the parent tract of land giving rise to the [present lots]....
[T]he language in [the Spyker deed] created a predial servitude restricting the commercial use of any servient estate[.] ...

(Our emphasis and brackets.)
Finding no merit in Brantley's contention that any such servitude was extinguished by the ten-year prescription of nonuse, the trial court preliminarily enjoined the Brantleys "from operating any commercial business or activity on [Lots 2 and 3-A], specifically including the operation of a used car lot, from placing signs on said property for commercial purposes; from storing for commercial purposes, used vehicles, their accessories, including parts thereof, and tires, or in any other manner, violating the predial servitude contained in [the Spyker deed]." Our brackets.

RIGHT TO ALIENATE / RIGHT TO USE
The right to use property and the right to dispose of property are separate and distinct attributes of ownership. La. C.C. art. 477. The latter right includes the right to alienate the property by selling it. Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641 (1915).
Contractual property restrictions may limit either or both the sale and the use of property. See generally A.N. Yiannopoulos, Property, 2 La. Civil Law Treatise (3d ed.1991), § 228 ["Restraints on Alienation"] and § 229 ["Restraints on Use"] at 431-440, as supplemented in 1998. See also Comment (b) to La. C.C. art. 775, enacted in 1977 to codify the law on building restrictions, which the case law had recognized as a type of real right establishing a general plan for subdivision development:
The law of building restrictions is a creature of Louisiana jurisprudence [citing Queensborough Land]. In this revision, building restrictions may merely involve restraints on the use of immovables. Restraints on alienation, to the extent that they may be valid under Louisiana law, are not effected [sic] by this revision.

(Our emphasis and brackets.)

RESTRAINTS ON ALIENATION
A contract purporting to remove property from the stream of commerce totally and perpetually is against public policy, but one placing partial and temporary restraints or conditions on alienation is not. Queensborough, supra; Terrell v. Messenger, 428 So.2d 1241 (La.App. 3d Cir.1983), writ denied.
Restraints on alienation which do not violate public policy have long been upheld. See, for example, the "right of first refusal" cases of Crawford v. Deshotels, 359 So.2d 118 (La.1978) (sale of undivided interest in land with option to purchase vendor's remaining interest) and Terrell, supra (sale of property to vendor's children and grandchildren, who agreed not to sell their interests except to one another during vendor's lifetime, and not to sell to a third party thereafter without first offering to sell to the other co-owners at the same price).
A restraint on alienation, like a restraint on use, may create either a personal obligation binding only on the parties to the agreement, or a real right running with the land which affects third parties when notice of it is recorded in the public records. See Queensborough, Terrell, supra; Yiannopoulos, supra, § 228. When the restraint on alienation constitutes a real right, it may be enforced as follows:
*710 In case of an impending violation, the restraint may be enforced by an action for injunction brought by the person who imposed the restraint or by [other] persons in whose favor the restraint was imposed. After violation, depending on the facts and circumstances of each case, a proper plaintiff may demand damages, resolution of the original transfer of the property, or merely annulment of the alienation made in violation of the restraint.
Yiannopoulos, supra, § 228 at 433; footnotes omitted. Our emphasis and brackets.
Mardis's action for injunctive relief is not founded on an impending sale of the property either to or by Brantley for a commercial purpose, but on Brantley's commercial use of his property. The 1959 restraint on the sale of the property is imposed in favor of the Brantleys' vendor.
Brantley's appeal questions the trial court's findings as to the nature and the extent of the restriction. According to Brantley, the restriction created only a personal obligation which "at most gives the vendor the right to sue the vendee if he sells [the property] for commercial purposes." Because Mardis is not Brantley's vendor, even as to Lot 3-A, which Brantley acquired "subject to" the 1959 restriction, and because the acts specified in the injunction pertain only to the use of the property, and not to its sale, Brantley contends the trial court erred in granting the preliminary injunction.

RULES OF INTERPRETATION
The existence and the extent of a servitude claimed under a contract must be determined from the face of the contract. La. C.C. art. 697; McGuffy, Ogden, supra. The title document must clearly reflect the intention of the contracting parties to create an obligation in favor of an estate rather than a person. Arts. 646-647, 731-734; McGuffy, Levy, supra. The title must be express as to the nature and the extent of the servitude, and must reasonably identify the servient estate that owes the obligation and the dominant estate to which the obligation is due. Williams, Camellia Place, supra.
When these elements are unclear or doubtful on the face of the title, a court may not supply them by implication or reform the language used in the title to broaden or restrict the terms of the original agreement. Ogden, supra; Dautreuil v. Degeyter, 436 So.2d 614 (La.App. 3d Cir.1983); Keeley v. Schexnailder, 97-1609 (La.App. 3d Cir.4/1/98), 708 So.2d 838. Doubt as to the existence, extent or manner of exercise of a servitude must be resolved in favor of the estate claimed to be burdened by the servitude. La. C.C. art. 730; Ogden, Williams, supra.

NATURE AND EXTENT OF RESTRICTION
The restriction here, which first appears in the April 1959 sale by Spyker to McClendon and White, is an agreement "by and between the Vendor and Vendees that the Vendees will not sell any of the ... property for commercial purposes without the approval of the Vendor." Our emphasis. The typewritten restriction does not mention the successors in interest of the parties, but is followed by the standard habendum clause in the cash deed form.
The restriction appears in some, but not all, subsequent sales of Lots 2 and 3: the October 1959 sale of Lots 2-5 by McClendon and White to Rudie Mardis, the 1959 sale of Lot 2 by Rudie Mardis to Jimmie Neal Atkins, the 1959 sale of Lot 3 by Rudie Mardis to Bobby Mardis, and the 1960 sale of Lot 3-B by Bobby Mardis to R.C. Mardis, Jr.
According to this record, many of the vendors in the respective acts mentioning the 1959 restriction owned other property in or near the subdivision. These respective vendors, of course, personally benefitted from the obligation imposed on each vendee not to sell one or more lots for a commercial purpose without the approval of that vendee's vendor.
The restriction in question here is neither as broad nor as explicit in scope as the covenant in McGuffy, supra, which created "a servitude or real obligation running with the land which is binding on [subsequent owners]":

*711 [The corner lot] shall never be sold, transferred or used except subject to the following limitation and restriction, to-wit:
That said property shall only be used for residential purposes....
It is understood that the foregoing restriction as to the use of the ... property ... shall be binding upon [the present owner] and all subsequent owners thereof however they may acquire.
240 La. at 763, 768, 125 So.2d at 156, 158. Our emphasis and brackets.
We emphasize similar language in Tucker v. Woodside, 53 So.2d 503, 504 (La.App. 1st Cir.1951) which was held to create a real rather than a personal obligation:

... [P]urchaser hereby binds and obligates herself unto the said [seller], Edward L. Woodside, never to build or permit the building of any saloon, nightclub or tourist court upon the property herein conveyed.
All the agreements and stipulations contained herein and all the obligations herein assumed, shall inure to the benefit of and be binding upon the heirs, successors and assigns of the respective parties hereto.
In LeBlanc v. Palmisano, supra, 43 So.2d at 264, the court found this language created only a personal obligation and not a covenant running with the land:
... No commercial property shall be permitted to be constructed or occupied as such on this property except by written consent of the Claiborne Avenue Extension Realty Company, Inc. (Our emphasis.)
The restriction in question here, in several successive transfers, states that the Vendee will not sell "without the approval of the Vendor." Conceivably, a vendor might approve a vendee's proposed sale of a subdivision lot for commercial purposes. Estates subject to a predial servitude neither buy nor sell. Only legal entities and persons buy and sell.
The agreement creating this restriction, whether viewed solely as the April 1959 deed in which it first appears or collectively by including some subsequent deeds or recorded instruments which state or refer to the 1959 restriction, does not clearly express what the law requires to establish a predial servitude. The restriction does not express that the contracting parties intended to create a predial servitude to benefit other property or estates or lots owned by each vendor. Neither does the restriction state that it is meant to be merely a personal obligation in each vendor's favor. In such circumstances, La. C.C. art. 730 requires that the doubt must be resolved in the obligor's [Brantley's] favor.
Even should we assume, arguendo, that the 1959 agreement created a predial servitude, as the trial court found, the extent of the restriction is expressly limited to the vendee's sale of the property for a commercial purpose without the approval of his vendor. The wording of the restriction does not unequivocally prohibit sales for commercial purposes but expressly allows for the vendor to consent to such a sale. See Le Blanc and other cases discussed supra. On this record, we cannot agree with the trial court's conclusion that the contracting parties legally accomplished what the court found they "wanted" or intended to do.
The extent of a servitude is regulated by the title by which it was created. La. C.C. art. 697. The reference in Brantley's 1994 acquisition of Lot 3-A to the "1959 restrictions regarding use for commercial purposes" does not alter or enlarge the terms of the 1959 restriction or agreements mentioning that restriction. The trial court's interpretation of the restriction to prohibit both the sale and the use of the property for a commercial purpose impermissibly reforms and transforms the servitude title by broadening the scope of the restricted conduct. See and compare Ogden, Dautreuil and Keeley, all cited supra.

CONCLUSION
The act which Mardis seeks to enjoin, preliminarily and permanently, is not the sale of the property by or to Brantley for a commercial purpose, but Brantley's use of the property for a commercial purpose after acquiring it from respective vendors other than Mardis. The 1959 restriction is nothing more than a personal obligation of Brantley *712 owed to his vendor of Lot 3-A, who is not the plaintiff in this action.
On this record, Mardis has not made a prima facie showing that he will likely prevail on the merits of the action for a permanent injunction, a prerequisite to obtaining a preliminary injunction. Louisiana Gaming Corp. v. Rob's Mini-Mart, supra.

DECREE
Reversing the judgment granting a preliminary injunction, we hereby render judgment denying that relief to plaintiff. Costs, here and below, are assessed to plaintiff.
REVERSED AND RENDERED.
NOTES
[1] Neither litigant invoked La. C.C.P. art. 3609, which gives the trial court discretion to order the taking of evidence by affidavit at a preliminary injunction hearing and requires the moving party to furnish the adverse party with copies of the affidavits he intends to use before the hearing.