# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 11, 2009

Charles R. Fulbruge III
Clerk

No. 08-30883
USDC No. 2:06-CV-3547

TEXTRON FINANCIAL CORP,

Plaintiff - Appellee

v.

RETIF OIL & FUEL LLC,

Intervenor - Appellant

v.

HILL CITY OIL COMPANY, INC,

Defendant.

-consolidated with-

No. 08-30907
USDC No. 2:07-CV-3779

SPE FO HOLDINGS LLC,

Plaintiff - Counter Defendant -
Appellee

v.

RETIF OIL & FUEL LLC,

Defendant - Third Party Plaintiff
-Counter Claimant - Appellant

v.

ROXANNA L IRWIN,

Third Party Defendant - Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana
New Orleans Division

Before JONES, Chief Judge, ELROD, Circuit Judge, and GUIROLA, District Judge.[*]

PER CURIAM:[**]

These consolidated appeals revolve around two properties along a waterway in Houma, Louisiana. Appellant Retif Oil & Fuel, LLC ("Retif") operates a maritime fuel station at one of these properties, and acquired a competitor's assets in a transaction that purported to encumber the other with a non-competition provision. The purportedly encumbered property went through sale, bankruptcy, foreclosure, and auction, and ended up in the hands of Appellee SPE FO Holdings LLC ("SPE") by means of a court-approved Marshal's deed. The parties dispute whether the encumbrance was ever effective, and whether it, or any associated contractual obligations, survived the property's tumultuous history so as to bind SPE. The district court held that the asset purchase did not encumber the property, and that SPE was not bound by any personal non-competition obligations. It accordingly granted SPE a declaratory judgment to that effect, and in separate proceedings denied requests by Retif to reform the Marshal's deed. Retif appeals. We affirm.

## I. FACTS AND PROCEEDINGS

### A. Factual Background

Appellant Retif operates a "fuel dock" from a property on Magnolia Street in Houma, Louisiana (the "Retif Property"). Vessels at a fuel dock can take on fuel and lubricants directly, like cars at a gas station. Less than a mile from the Retif Property is another waterfront property (the "Dunn Street Property") that has undergone ownership changes leading to this dispute.

---

[*] District Judge, Southern District of Mississippi, sitting by designation.

[**] Pursuant to Fifth Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Fifth Circuit Rule 47.5.4.

Hill City Oil Co. ("Hill City"), a defendant in one action below but not a party to this appeal, operated a fuel dock from the Dunn Street Property until 2004. In May, 2004, Hill City sold its fuel dock business (but not the property) to Retif. The parties entered into an Asset Purchase and Sale Agreement under which Hill City transferred assets including equipment and customer lists to Retif. Of particular importance to this case, they also executed a deed restriction entitled "Building and Ownership Restrictions" (the "Restrictions").

The Restrictions prohibit use of the Dunn Street Property as a retail fuel dock, and state that this limitation is "to run with the land and shall be binding on all present and future owners . . . ." Enforcement is "reserved solely to Retif" and its corporate successors. The document is signed not only by Retif and Hill Oil, but also by State Bank & Trust Co. ("State Bank"), which held a mortgage on the Dunn Street Property. Retif negotiated with State Bank and obtained the latter's agreement to subordinate the mortgage to the Restrictions. The parties promptly recorded the Restrictions in the parish real property records.

Hill City declared Chapter 11 bankruptcy several months later, but its ownership of the Dunn Street Property survived the bankruptcy. The Plan of Reorganization, signed May 12, 2005, vested the property in Hill City "free and clear of all liens, claims and interests of holders of Claims and Equity Interests, except as provided in the Plan." The State Bank mortgage on the Dunn Street Property also survived. The parties dispute whether encumbrances on the Dunn Street Property from the Restrictions, if there were any to start with, survived the bankruptcy.

A year after Hill City's plan confirmation, continuing financial problems led to foreclosure on the Dunn Street Property. State Bank sold the mortgage to Appellee Textron Financial Corp ("Textron") on July 7, 2006. Several days later, Textron filed an executory process action against Hill City in the district

court. The district court ultimately ordered the Dunn Street Property (among others not relevant here) seized and sold by the U.S. Marshal. The public notices stated the property was for sale "AS IS, WHERE IS," free and clear of encumbrances junior to the Textron mortgage. SPE, a subsidiary of Textron, purchased the properties at auction.[1] The district court confirmed the sale on January 3, 2007. The conveyance was by a Marshal's deed stating the property was sold "free and clear of all liens, mortgages, privileges and encumbrances of any nature or kind whatsoever."

## B. Proceedings Below

SPE envisioned utilizing the Dunn Street Property as a fuel dock, and accordingly filed suit against Retif on July 19, 2007, seeking declaratory judgment that it held the property free and clear of non-competition limitations. Retif counterclaimed for a contrary declaratory judgment, and filed a cross-claim against Appellee Roxanna Irwin, then the U.S. Marshal, seeking to compel her to issue a new deed reflecting the Restrictions.[2]

Retif also intervened, on December 18, 2007, in Textron's executory process action against Hill City, which had resulted in the sale of the Dunn

---

[1] Retif asserts that, technically, Textron was the high bidder, but it arranged with the district court for SPE to accept title. This distinction is not relevant to our disposition of the case.

[2] The district court dismissed as moot the claims against the U.S. Marshal in the declaratory judgment action, and Ms. Irwin's successor argues on appeal that there was no jurisdiction for claims against the Marshal in that suit. Counsel for Retif stated the following at oral argument regarding the Marshal:

> The Marshal was simply named as a formal party just to cover our bases to make sure that there would be no problem with having the Marshal's deed corrected or the foreclosure sale redone, and with the representations made by the U.S. Attorney that the Marshal is going to comply with any order issued by the district court we have no beef with the Marshal's service. There are no claims for damages or anything like that.

Our disposition of the case renders it unnecessary for us to determine whether the Marshal was properly joined. We note that there was never an allegation that the Marshal's Service acted improperly in carrying out its duties.

4

Street Property to SPE the previous January. Retif sought by various procedural mechanisms, including motions to vacate or correct the order confirming sale of the Dunn Street Property and for relief from judgment under Federal Rule of Civil Procedure 60, to reopen the proceedings in order to allow reformation of the Marshal's deed.

On a motion for summary judgment by SPE in the declaratory judgment action, the district court held that the Restrictions created no non-competition obligations that would run with the land. Later it held that they also did not impose any personal obligations on SPE, resulting in complete summary judgment in SPE's favor. As a result of its holding that the Restrictions created no real obligations, the district court also denied relief to Retif in the executory process action.

## II. STANDARD OF REVIEW

The district court's grant of summary judgment in the declaratory judgment action is reviewed *de novo*. *See Paul v. Landsafe Flood Determination, Inc.*, 550 F.3d 511, 513 (5th Cir. 2008). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We view facts and inferences in the light most favorable to Retif. *Id.*

The parties agree that the district court's rulings in response to Retif's efforts to reopen the executory process action are reviewed for abuse of discretion. *See, e.g.*, *Behringer v. Johnson*, 75 F.3d 189, 190 (5th Cir. 1996) (applying abuse of discretion review to denial of relief under Federal Rule of Civil Procedure 60(b)); *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir. 1997) (same for denial of motion for new trial).

## III. ANALYSIS

Under Louisiana law,[3] "[a]n agreement restricting the use of immovable property may constitute either a personal obligation binding only on the parties to the agreement or a predial servitude binding on the successors in title of the parties." *Mardis v. Brantley*, 717 So. 2d 702, 704 (La. App. 2d Cir. 1998). Retif argues that the Restrictions created both types of obligation, and that the obligations survived subsequent events and should bind SPE.[4] We agree with the district court that the Restrictions did not create a predial servitude, and that SPE bears no personal non-competition obligations, because its predecessor in title, Textron, assumed no such obligations when it purchased the mortgage to the Dunn Street Property.

## A.    Existence of a Predial Servitude

A predial servitude is an encumbrance on one property for the benefit of another. *See* La. Civ. Code. art. 646 ("A predial servitude is a charge on a servient estate for the benefit of a dominant estate. The two estates must belong to different owners."). "The owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate

---

[3] 28 U.S.C. § 1332 provides the basis for federal jurisdiction for both actions, because Retif is a citizen of Louisiana, and SPE, Textron, and Hill City are not, and because the disputes meet the amount in controversy requirement. There is no dispute that Louisiana property and contract law apply.

Our task in a diversity action is to apply the affected state's law, including law "declared by its Legislature in a statute or by its highest court in a decision." *Erie R.R. Co. v. Tomkins*, 304 U.S. 64, 78 (1938). Where such a source does not directly decide the question, we decide it as we predict the highest court of the affected state would. *See First Nat'l Bank of Durant v. Trans Terra Corp. Int'l*, 142 F.3d 802, 806 (5th Cir. 1998). *Erie* analysis under Louisiana law has "special dimensions because of [the] unique Civilian tradition," such that "the Erie obligation is to the Code" and caselaw constitutes "secondary information." *See generally Songbyrd, Inc. v. Bearsville Records, Inc.*, 104 F.3d 773, 776–77 (5th Cir. 1997).

[4] The rulings of the district court consider some additional theories, but these are the ones Retif presses on appeal.

or to permit something to be done on it." *Id.* art. 651. The estates need not be proximate or contiguous, as long as they are "located as to allow one to derive some benefit from the charge on the other." *Id.* art. 648. The servitude runs with the land. It is "inseparable from the dominant estate and passes with it" through ownership changes, and the associated rights "cannot be alienated, leased, or encumbered separately from the dominant estate." *Id.* art. 650.

In order to create a predial servitude, an instrument must "reasonably identify" both the dominant and servient estates. *Mardis*, 717 So. 2d at 704. This requires enough specificity to overcome Louisiana's disfavor toward encumbrances. Louisiana law "favors the free and unrestricted use of immovable property," *Leonard v. Lavigne*, 162 So. 2d 341, 343 (La. 1964), and "doubt as to the existence, extent or manner of exercise of a predial servitude shall be resolved in favor of the servient estate."[5] La. Civ. Code. art. 730.

The Restrictions do not create a predial servitude, because they purport to encumber the Dunn Street Property for the benefit of Retif as a corporate entity, and not for the benefit of any specified dominant estate. The Restrictions identify the Dunn Street Property as the servient estate, and provide that the limitations "run with the land and shall be binding on all present and future owners, purchasers, and/or lessees" of the Dunn Street Property until May 31, 2014. But there is no mention of a dominant estate. Rather, benefits and enforcement adhere to Retif as an entity. The "ENFORCEMENT" section provides in pertinent part:

> Enforcement of these restrictions are [sic] reserved
> solely to Retif Oil & Fuel, L.L.C., and/or its successor(s)
> in interest by merger or consolidation ("Retif") and only

---

[5] We note that this case presents exactly the type of anti-competitive limitation that Louisiana law disfavors. Retif rather candidly admits that "[w]ithout the Non-Competition Agreement and Deed Restriction, the assets being purchased by Retif had very little value, and Retif would not have purchased these assets."

so long as Retif operates a fuel dock for commercial lubricant and fuel sales in Terrebonne Parish, whether or not such fuel dock is located at the [Dunn Street Property].

This arrangement is directly contrary to the statutory definition of predial servitude; there can be no predial servitude against a servient estate for the benefit of a person rather than another estate. *See* A.N. Yiannopolis, Predial Servitudes § 9, *in* 4 Louisiana Civil Law Treatise at 30 (3d ed. 2004); *Mardis*, 717 So. 2d at 704 ("In order to constitute a real right rather than a personal obligation, the restriction must be established for the benefit of an *estate* rather than for the benefit of a particular person." (citations omitted)). Civil Code Article 650 provides that the servitude continues to benefit the dominant estate if the estate is alienated. In contrast, the Restrictions purport to benefit Retif as an entity, as long as it operates "a" fuel dock in the parish. This means the supposed benefit would not run with the land, but would follow Retif to another fuel dock if it moved its business. Further, the Restrictions state these benefits run to Retif's corporate successors, and make no mention of successors in ownership of real property. Especially considering the Louisiana policy to resolve doubts in favor of the owner of a purportedly encumbered property, *Leonard*, 162 So.2d at 343, the instrument does not reasonably identify a dominant estate, and therefore creates no predial servitude.

Retif argues that the Restrictions reasonably identified the Retif Property as the dominant estate because the Restrictions acknowledge Retif as "the owner of a fuel dock in Terrebonne Parish," and because it was common knowledge, recorded in public documents and known to the parties in this dispute, that Retif ran its business from the Retif Property. The plain language of the Restrictions does not sustain these arguments. In context, the reference in the restrictions to Retif as running "a fuel dock in Terrebonne Parish" refers

to a fuel dock anywhere in Terrebonne Parish. It even contemplates Retif possibly running a fuel dock at the Dunn Street Property. Furthermore, the restrictions not only fail to identify a dominant estate to whose benefit the burdens run, but specify to the contrary that they run to Retif as an entity, along with its corporate successors.

Retif cites *R & K Bluebonnet, Inc. v. Patout's of Baton Rouge, Inc.*, 521 So. 2d 634 (La. App. 1st Cir. 1988), for the proposition that an instrument can create a predial servitude even if it does not expressly identify the dominant estate. In that case, a family sold part of a ten acre tract with the following restriction: "Buyer agrees that the property herein purchased will not be used as a seafood restaurant for at least sixty (60) months from the date hereof, which agreement shall act as a building restriction on the above described property." *Id.* at 635. The court of appeals held that this created a predial servitude. While the act of sale did not specify the seller's remaining property as the dominant estate, the court considered it "apparent that the restriction was meant to operate in favor of the remaining property owned by the vendors from which the parcel sold . . . was taken." *Id.*

The specification of the two properties in the act of sale distinguishes *R & K Bluebonnet* from the present case. As required by Civil Code Article 646, the relevant instrument specified "two estates . . . belong[ing] to different owners," because it specified a single tract that was then divided. Inasmuch as these were the only estates mentioned, the court considered it "apparent" that the non-competition limitations imposed on the new tract benefited the property from which it had been carved. No comparable circumstance appears in the present case. The Dunn Street Property was a separate tract from the Retif Property all along. The restrictions attach legal conditions only to a single estate, and emphatically specify Retif, the corporate entity, as the sole

beneficiary of those conditions. Because the instrument in *R & K Bluebonnet* concerned two estates and the instrument in the present case does not, *R & K Bluebonnet* does not help Retif overcome the statutory requirement that an instrument identify both a dominant and a servient estate to create a predial servitude.[6]

Because the Restrictions created no predial servitude, the district court was correct to grant summary judgment on that point in the declaratory judgment action. For the same reason, the district court did not abuse its discretion when it rejected Retif's requests to reopen the executory process action and reform the Marshal's deed.[7]

## B.    Existence of a Personal Obligation

Retif argues that, even if no servitude ran with the land, SPE is personally bound by the non-competition limitations on the Dunn Street Property. More specifically, Retif proposes that the Restrictions bind SPE as a matter of Louisiana contract law, based on the following three-step argument: (1) State Bank agreed with Retif that State Bank would be bound by, and

---

[6] Retif also cites, with little further discussion, Louisiana Civil Code Article 734 and *Burgas v. Stoutz*, 141 So. 67 (La. 1932), for the proposition that "[a] deed granting a servitude to 'purchaser, its successors and assigns' creates a predial servitude." Article 734 provides that a "right granted . . . merely for the convenience of a person . . . is not considered to be a predial servitude, unless it is acquired by a person *as owner of an estate* for himself, his heirs and assigns." (emphasis added); *accord Stoutz*, 141 So. at 591 ("Since the purchasers of Lot 'A,' stipulating the servitude of passage over Lot 'B,' owned by defendant, acquired it *as owners of* Lot 'A,' and for their successors and assigns, it is clear that the right became real and is a predial servitude." (emphasis added)); *id.* at 592 ("It is also significant that the right of passage over Lot 'B' was not given to a named individual, but to 'the purchaser,' the owner of Lot 'A,' thereby connecting the servitude with the property . . . and not as a mere matter of convenience to a particular person . . ."). As discussed above, the Restrictions emphatically purport to encumber the Dunn Street Property "as a mere matter of convenience" to Retif, as a corporate entity and not in its capacity as owner of the Retif Property.

[7] Because we hold there was no predial servitude, it is not necessary for us to consider SPE's alternative theories that any such servitude failed to survive the bankruptcy or the Marshal's sale.

subordinate its mortgage to, the Restrictions; (2) Textron agreed to assume all obligations of State Bank when it purchased the mortgage; (3) SPE is also bound, because it is an alter ego of Textron, which directed SPE to acquire the property in an illegitimate attempt to avoid the personal obligations.[8]

The only issue in this appeal concerns step two: whether Textron agreed to assume State Bank's contractual commitment to recognize the Restrictions. The parties do not dispute that State Bank agreed to the Restrictions. While they do dispute the alter ego point, neither side contends that it is relevant to deciding the appeal. The district court held that if Textron assumed State Bank's obligations, the alter ego question would present a fact issue, precluding summary judgment. SPE concedes as much on appeal. For its part, Retif presents a plausible—and alarming—case that Textron's counsel knew about State Bank's obligations to Retif, and worked to obtain the property and convey it to SPE in a manner that stripped these obligations away. But Retif does not present any theory—estoppel, for example—that might limit Textron's or SPE's use of the property based on that alleged knowledge and conduct. Retif's sole argument for imposing non-competition limitations on SPE is that Textron (and its alleged alter ego, SPE) assumed State Bank's non-competition obligations by the terms of Textron's purchase agreement with State Bank. While we consider Textron's conduct to be suspect, we agree with the district court that no such assumption occurred.

Louisiana Civil Code Article 1821 provides: "An obligor and a third person may agree to an assumption by the latter of an obligation of the former. To be enforceable by the obligee against the third person, the agreement must be

---

[8] SPE does not dispute that the *contractual* obligations between State Bank and Hill City survived Hill City's bankruptcy. Accordingly, any personal obligation of State Bank to acknowledge Retif's superior rights theoretically could have been assumed by another party subsequent to the bankruptcy.

made in writing." When a party alleges such an assumption occurred as part of an agreement on other subjects between the obligor and the third person, we have evaluated the claim under the rubric of *stipulation pour autrui*, the Louisiana doctrine of third-party beneficiaries. *See generally Davis Oil Co. v. TS, Inc.*, 145 F.3d 305, 310–11 (5th Cir. 1998). In order to find contractual intent for one party to a contract to assume obligations benefitting a nonparty obligee of the other party, the contract must "*clearly* contemplate[ ] the benefit to the third person as its condition or consideration." *Id.* at 311. "[E]xplicit reference to the individual, assumed obligation" is not necessary, but the clear intent to benefit the third-party must be "apparent from the face of the document." *Id.*

Citing *Davis*, Retif argues that Textron assumed non-competition obligations through the Purchase and Sale Agreement between State Bank (as Seller) and Textron (as mortgage Purchaser).[9] Retif relies in particular on a line each from sections 1.1 and 2.1. Section 2.1 provides that "[s]ubject to the terms and conditions of this Agreement . . . [Textron] shall assume and agree to perform and discharge all liabilities and obligations of Seller arising on or after the Closing Date pursuant to the Purchased Loans . . . ." Section 1.1 provides that "Purchased Loans" includes "all loans, security deposits, all security for any guarantees of the payment of the foregoing, *and all documents and instruments relating to the foregoing*, . . . owing . . . to Seller" (emphasis

_____

[9] As noted above, this agreement transferred mortgages to a number of properties, including the Dunn Street Property.

added).[10]    Retif argues that the Restrictions constitute a document or instrument relating to loans "owing to . . . seller." Therefore, they constitute a Purchased Loan, and Textron was obligated to "perform and discharge all . . . obligations of [State Bank] . . . pursuant to the [Restrictions]."

Retif presents a colorable argument, but we are not persuaded that these sections "clearly contemplate" obligations to Retif as a third-party beneficiary. *See Davis*, 145 F.3d at 310–11.  Section 1.1 does not merely define "Purchased Loan."  It also describes what the parties intend to do with the Purchased Loans: transfer them "free and clear of all claims and encumbrances." Section 2.1 creates further problems for Retif's interpretation. It obligates Textron to assume only obligations "arising on and after the Closing Date."  Unlike affirmative obligations that would periodically arise in connection with a mortgage—to provide notice to the mortgagor of some event, for example—non-competition obligations are constant and negative.  It is problematic to speak of them as "arising" at any point after their initial creation.  Retif fails to explain how Section 2.1, in light of this difficulty, could clearly contemplate imposing the obligations Retif now seeks to enforce.

The remainder of the agreement further undermines Retif's argument. Section 5.5 indicates that the Purchased Loans "constitute valid, undisputed claims of Seller," with no mention of obligations to a party like Retif.[11]  Section

---

[10] More completely, Section 1.1 provides in pertinent part that "Seller hereby agrees to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser agrees to purchase from Seller, free and clear of all claims and encumbrances . . . (i) all loans, security deposits, all security for and guarantees of the payment of the foregoing, and all documents and instruments related to the foregoing . . . and all rights appurtenant to the foregoing, as well as all unpaid amounts owed or owing . . . to Seller . . . (collectively, the 'Purchased Loans')."

[11] "5.5  Purchased Loans. All Purchased Loans . . . have arisen in the ordinary course of business and constitute valid, undisputed claims of Seller and each Purchased Loan is payable in the recorded amount on the Loan Trial Balance Report and is not subject to claims of set-off or other defenses or counterclaims.  The Purchased Loans are,

5.5(a) indicates, again, that there are no encumbrances.[12] Section 5.5(n) indicates that no rights in the purchased loans have been waived through "side agreements."[13] Finally, Section 14.6 states that the parties do not intend to benefit third parties.[14]

Reading the contract altogether, we conclude the parties did not clearly intend for Textron to assume obligations to Retif as part of the consideration for Textron's agreement with State Bank. Accordingly, the Restrictions do not personally bind Textron, and even assuming an alter ego finding they do not bind SPE, either.

## C. Affirmance, and Issues not Reached

Retif has failed to establish the existence of a real or personal non-competition obligation that would bind SPE as owner of the Dunn Street Property. We must accordingly affirm the district court's summary judgment and declaratory judgment to that effect, as well as its denial of Retif's motion for reconsideration of the same issues. Likewise, because Retif fails to establish the existence of an encumbrance on the property, the district court did not

---

and will be as of the date of Closing, all of the outstanding loans, indebtedness, and other obligations of [Hill City and its owner to State Bank]. . . ."

[12] "5.5(a) . . . Seller has good and valid title to, and is the sole owner of each Purchased Loan free and clear of all security interests, judgments, liens . . . obligations, claims, or encumbrances . . . ."

[13] "5.5(n) Seller has granted access to Purchaser to all final documents in the possession or control of Seller pertaining to each Purchased Loan, including all side agreements relating thereto . . . and the terms of each Purchased Loan have not been modified or waived in any respect . . . ."

[14] "14.6 No Rights of Third Parties. Nothing in this Agreement is intended to confer any right on any person other than the parties to it and their respective successors and assigns; nor is anything in this Agreement intended to modify or discharge the obligation or liability of any third person to any party to this Agreement . . . ."

abuse its discretion when it rejected Retif's requests to re-open the executory process action and reform the Marshal's deed.

Our ruling is narrow, based on the specific grounds Retif has asserted to challenge the judgments below. It should not be interpreted as expressing approval of the manner in which Textron and SPE obtained the Dunn Street Property. In particular, while we reject Retif's assertion that Textron intended to assume obligations to Retif from State Bank, the opposite conclusion hardly reflects well on Textron. There are arguably grounds to conclude from this record that Textron (or its counsel at least) knew about Hill City's obligations to Retif, and intentionally induced Hill City to convey the property to Textron in a manner that subverted those obligations. Further, we have concerns about the candor of counsel in the executory process action, which culminated in the issuance of a Marshal's deed without resolution of the controversy we have addressed. We should not be interpreted to opine one way or the other on any further claims or complaints that might arise in response to these issues.

## IV. CONCLUSION

Because Retif fails to establish the existence of a real non-competition obligation, or the assumption of a personal obligation, that would bind SPE as owner of the Dunn Street Property, the rulings of the district court are AFFIRMED.